# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                        **CASE NO: 6:21-cr-15-CEM-LHP**

**SHAWN MICHAEL CHALIFOUX**

---

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

Through prior proceedings under 18 U.S.C. §§ 4241(d) and 4247, the undersigned previously found Defendant Shawn Michael Chalifoux ("Chalifoux") incompetent to proceed in this case. Doc. Nos. 158, 181, 186. However, based on the forensic report from the Federal Bureau of Prisons ("BOP"), the United States made an oral motion pursuant to *Sell v. United States*, 539 U.S. 166 (2003) to involuntarily administer antipsychotic medications to Chalifoux to restore his competency to proceed. Doc. Nos. 181, 183, 186. The undersigned thereafter directed the parties to file pre-and-post-hearing briefing and conducted an evidentiary hearing on the matter on April 2, 2024. Doc. Nos. 186, 190, 195, 201, 243, 247–49. For the reasons discussed below, the undersigned will **RESPECTFULLY RECOMMEND** that the United States' request be **GRANTED**.

## I.     BACKGROUND

On February 3, 2021, a grand jury indicted Chalifoux on one count of conspiracy to distribute 50 grams or more of methamphetamine (Count I), two counts of distribution of a substance containing a detectable amount of heroin and 5 grams or more of methamphetamine (Counts II and III, respectively), and one count of aiding and abetting in the distribution of 5 grams or more of methamphetamine (Count IV), in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), 841(a)(1), 841(b)(1)(C), and 841(b)(1)(B).   Doc. No. 1.   An initial appearance and arraignment hearing was held before the undersigned on February 11, 2021, during which counsel was appointed under the Criminal Justice Act,[1] a plea of not guilty was entered on Chalifoux's behalf as to all charges, and Chalifoux was detained pending trial, with Chalifoux reserving his right for a hearing in the future.   Doc. Nos. 9–11, 13–14.   On motion of Chalifoux, a detention hearing was held on April 22, 2021, at the conclusion of which the undersigned ordered Chalifoux detained pending trial on the basis that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community.   Doc.

---

[1] The undersigned initially appointed Attorney Thomas D. Sommerville to represent Chalifoux.   Doc. No. 11.   On February 23, 2021, Attorney Bryan Loughran Brito appeared as retained counsel, and Attorney Sommerville was granted leave to withdraw on February 25, 2021.   Doc. Nos. 33, 35–36.

Nos. 45–51.   Chalifoux remains detained and in the custody of the United States

Marshals Service ("USMS") as of the date of this report.

The case proceeded in the normal course, and Chalifoux ultimately executed

a plea agreement on June 17, 2021, in which Chalifoux agreed to plead guilty to the

charge of conspiracy to distribute 50 grams or more of methamphetamine in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).   Doc. No. 68.   A change of plea

hearing was held that same day before United States District Judge Carlos E.

Mendoza.   Doc. Nos. 59, 65.   Sentencing was scheduled before Judge Mendoza for

September 28, 2021.   Doc. Nos. 67, 76, 83, 90–91.

The sentencing hearing did not take place as scheduled.   Instead, on

September 28, 2021 Chalifoux's then-retained counsel Attorney Brito moved to

withdraw, which motion Judge Mendoza granted and appointed Attorney

Mauricio Hued to represent Chalifoux.   Doc. Nos. 92–94, 97.   At a subsequent

October 19, 2021 status conference Attorney Hued moved to withdraw, which

Judge Mendoza granted and appointed Attorney Blair Jackson to represent

Chalifoux.   Doc. Nos. 100–01, 104–06.[2]   Judge Mendoza then reset the sentencing

hearing for February 1, 2022.   Doc. No. 108.

---

[2] As of the date of this Report, Attorney Jackson remains Chalifoux's counsel of record, and on February 27, 2024, the undersigned appointed Attorney Michael Wm. Nielsen as co-counsel.   Doc. No. 230; *see also* Guide to Judicial Policy, Vol. 7, Ch. 2, Part A, § 230.53.20.

That sentencing hearing also did not take place as scheduled. Instead, on January 25, 2022, Chalifoux moved to withdraw his guilty plea on the basis that his prior counsel did not adequately explain all factors of the plea agreement and did not provide or review any discovery with Chalifoux. Doc. No. 114. Judge Mendoza held a hearing on the motion to withdraw on February 14, 2022, during which the question of Chalifoux's competency was raised for the first time. Doc. No. 123. Specifically, Chalifoux's counsel orally moved for a psychological evaluation, which Judge Mendoza granted and referred the matter to the undersigned. Doc. Nos. 123–25.

The undersigned held a status conference with counsel for the parties via the online Zoom platform on February 16, 2022. Doc. Nos. 128–30. Following discussion with counsel at that status conference, on February 24, 2022, the undersigned entered an order finding reasonable cause existed to believe that Chalifoux may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Doc. No. 132. In that same order, the undersigned also granted the United States' unopposed motion and appointed Dr. Randy K. Otto, Ph.D., a licensed clinical psychologist, to examine Chalifoux and render an opinion regarding his competency. *Id.*

Dr. Otto submitted his report on April 1, 2022.   Doc. No. 245-3; *see also* Doc. No. 141.[3]   Dr. Otto diagnosed Chalifoux with delusional disorder, persecutory type, and opined that he was incompetent to proceed.[4]   Doc. No. 245-3, at 5, 9. The undersigned held another Zoom status conference with counsel for both parties on April 13, 2022 to discuss further proceedings.   Doc. Nos. 142–44; *see also* Doc. No. 147.   The United States thereafter moved for a competency evidentiary hearing.   Doc. No. 148; *see also* Doc. No. 150.   Following an additional status conference with counsel, Doc. Nos. 149, 151, the undersigned scheduled an evidentiary hearing for May 25, 2022.   Doc. Nos. 152–53.

The evidentiary hearing went forward as scheduled, at which only one witness — Dr. Otto — testified.   Doc. No. 154; *see also* Doc. Nos. 155–56.   On May 26, 2022, the United States filed a notice stating that it no longer contested Chalifoux's competency and agreed that he was presently not competent to stand trial.   Doc. No. 157.   The following day, based on the evidence submitted and the parties' agreement on the issue, the undersigned found Chalifoux not mentally

---

[3] Many of the exhibits discussed in this Report were admitted under seal, however they were discussed throughout the competency hearing, which was open to the public, and are cited repeatedly in the parties' pre-and-post-hearing memoranda, which were filed on the public docket.   *See* Doc. Nos. 190, 195, 248–49.   Thus, while the exhibits at present may still be sealed, the undersigned discusses them in detail in this Report and Recommendation.

[4] Dr. Otto also diagnosed Chalifoux with opioid use disorder, cannabis use disorder, and possible major depressive disorder, all three of which were in remission. Doc. No. 245-3, at 5–6.

competent as that term is defined in 18 U.S.C. § 4241(a).   Doc. No. 158.   The undersigned committed Chalifoux to the custody of the Attorney General to be hospitalized for treatment in a suitable facility for a reasonable period of time not to exceed four months, as was necessary to determine whether there was a substantial probability that Chalifoux would attain the capacity to proceed in the near future.   *Id., see also* 18 U.S.C. § 4242(d)(1).

On September 11, 2023, Dr. Sarah L. Burton, Ph.D., Forensic Unit Psychologist at the Federal Bureau of Prisons, U.S. Medical Center for Federal Prisoners, Springfield, Missouri ("FMC Missouri"), submitted a forensic psychological report, through which Dr. Burton opined that Chalifoux is not competent to proceed.   Doc. No. 245-1; *see also* Doc. No. 181.   However, in that same report, Dr. Burton further opined that if Chalifoux were administered antipsychotic medication, there is a substantial probability that Chalifoux would be restored to competency within the foreseeable future.   *Id.*   Based on Dr. Burton's report, the undersigned held a status conference with counsel on September 19, 2023, at the conclusion of which the undersigned found that an additional period of commitment of up to six (6) months was warranted under 18 U.S.C. § 4241(d)(2)(A).   Doc. Nos. 182–83, 186. The undersigned also directed the parties to file legal memoranda on the question of whether the Court should order the involuntary administration of antipsychotic

medications to Chalifoux in order to render him competent to proceed.   Doc. No. 186, at 3–4.

Upon review of the parties' memoranda, Doc. Nos. 190, 195, the undersigned held an additional Zoom status conference with counsel on November 15, 2023, and thereafter scheduled an evidentiary hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003) for February 27, 2024.   Doc. Nos. 197–201.   Although the parties diligently prepared for the hearing, *see, e.g.*, Doc. Nos. 203, 205–12, 217, 219–22, 226, 228, the evidentiary hearing did not go forward on February 27, 2024.   *See* Doc. No. 229.   Instead, due to the fact that Chalifoux's expert, Dr. Richart L. DeMier, Ph.D., ABPP, was unable to complete an evaluation of Chalifoux, the undersigned continued the hearing to April 2, 2024.   Doc. Nos. 229–30.[5]

The evidentiary hearing went forward as scheduled on April 2, 2024.   Doc. No. 243.   During the hearing three witnesses testified, two on behalf of the United States:   Dr. Burton and Dr. Shawn Rice, M.D., and one on behalf of Chalifoux: Dr. DeMier.   *Id.*   All three witnesses testified as experts, without objection.   In addition, the parties jointly filed 12 exhibits, each of which were admitted into evidence without objection, and the undersigned took judicial notice without

---

[5] While these competency proceedings were ongoing, Chalifoux filed numerous *pro se* documents, including several interlocutory appeals to the Eleventh Circuit Court of Appeals.   Each filing was unsuccessful.   *See, e.g.*, Doc. Nos. 167–68, 175–77, 180, 187–89, 191, 202, 204, 214, 216, 223, 234.

objection of the indictment (Doc. No. 1), plea agreement (Doc. No. 68), and

presentence investigation report (Doc. No. 79).   Doc. No. 245; *see also* Doc. No. 247,

at 7–9.   Counsel for both sides also submitted post-hearing legal memoranda,

which the undersigned has considered.   Doc. Nos. 248–49.[6]   This Report and

Recommendation follows.

## II.    SUMMARY OF THE EVIDENCE[7]

### A.    *Dr. Sarah Burton, Ph.D.*

Dr. Burton is a forensic unit psychologist at FMC Missouri and has been

employed there since December 2017.   Tr., 11.   Dr. Burton is a graduate of the

Rosalind Franklin University of Medicine and Science, with a Ph.D. in Clinical

Psychology, and an M.S. in both Health Administration and in Clinical Psychology.

Doc. No. 245-2, at 1.   Prior to joining FMC Missouri, Dr. Burton worked as a Staff

Psychologist and Mental Health Treatment Coordinator, as well as a Sex Offender

Program Specialist for the United States Penitentiary in Marion, Illinois.   *Id.*   Dr.

Burton has been published on numerous occasions, is a licensed clinical

psychologist, and is a Certified Correctional Health Professional — Mental Health,

---

[6] The United States also made a brief closing argument at the conclusion of the
evidentiary hearing, while counsel for Chalifoux reserved his arguments for post-hearing
briefing.   Doc. No. 247, at 103–09.

[7] The transcript of the April 2, 2024 evidentiary hearing is available at Doc. No. 247,
and will be cited as (Tr., [page #]).

through the National Commission on Correctional Health Care.   *Id.*, at 4.   She is
also the current supervisor for Doctoral Psychology Internship, Forensic Evaluation
Rotation at FMC Missouri.   *Id.*, at 3.

For the past 2.5 years, Dr. Burton has been exclusively conducting pretrial
competency evaluations (at least 50–75 to date), with the overwhelming majority
involving competency restoration evaluations.   Tr., 11–12.   Several of the
evaluations have also involved rendering opinions about the involuntary
administration of antipsychotic medication.   Tr., 12.   Dr. Burton testified as an
expert in forensic psychology without objection.   Tr., 44.

Dr. Burton evaluated Chalifoux while he was at FMC Missouri and authored
a forensic psychological report as to his competency.   Tr., 12; Doc. No. 245-1.   As
part of her evaluation, Dr. Burton met with Chalifoux on several occasions.   She
conducted a forensic intake examination, saw him routinely during her rounds,
conducted three forensic interviews of approximately 1.5 hours each, and
attempted to administer psychological testing to Chalifoux on another occasion.
Tr., 14, 25; Doc. No. 245-1, at 5–6.   Chalifoux also attended 11 competency
restoration group sessions, and Dr. Burton would receive reports on Chalifoux's
progress and behavior at these sessions, as well as reports from nurses and other
staff who observed Chalifoux daily.   Tr., 14, 15, 29–30, 40–41; Doc. No. 245-1, at 2.
Dr. Burton also interviewed Chalifoux's ex-girlfriend and daughter, and reviewed

numerous documents, including investigative materials and criminal history records for Chalifoux, Dr. Otto's report, a USMS custody/detention report, and emails written by Chalifoux, including emails and requests to FMC Missouri staff. Doc. No. 245-1, at 1–2, 5–6.

With respect to the psychological testing, Dr. Burton attempted to administer a Reading Level Indicator, which is a measure designed to assess an individual's reading level.    Tr., 14.    Chalifoux wrote a statement to the effect that his competency hearing and commitment were illegal, and otherwise failed to respond. Tr., 14–15, 31; Doc. No. 245-1, at 4, 7.    Chalifoux wrote similar statements on his knowledge check worksheets following competency restoration sessions.    Tr., 15, 29–30.[8]

Dr. Burton ultimately diagnosed Chalifoux with delusional disorder, persecutory type.    Tr., 16; Doc. No. 245-1, at 8.    Dr. Burton observed that Chalifoux presented with rigid and fixed false beliefs of a paranoid nature and believed that various individuals were conspiring against him specific to his legal proceedings. Tr., 16–17; Doc. No. 245-1, at 9.    Dr. Burton found Chalifoux to perceive the judge, attorneys, and others to be involved in this conspiracy, and interpreted new

---

[8] Interim Status Reports from FMC Missouri dated November 17, 2023 and January 12, 2024 note Chalifoux continuing to make similar statements during his competency restoration sessions and refusing to complete the knowledge worksheets.    Doc. Nos. 245-6, 245-7.

information to fit within this belief.   Tr., 16; Doc. No. 245-1, at 5, 7.   Dr. Burton further opined that Chalifoux's delusional disorder rendered him incompetent to proceed, and that he is unlikely to be restored to competency in the foreseeable future in the absence of antipsychotic medication.   Tr., 17–18.   Dr. Burton further testified that while Chalifoux was at FMC Missouri, several attempts were made to obtain Chalifoux's voluntary consent to medication, but he consistently declined to consent.   Tr., 18, 19; Doc. No. 245-1, at 6; *see also* Doc. Nos. 245-6, 245-7.

Dr. Burton opined that Chalifoux's symptoms of delusional disorder constitute a chronic mental illness, and that his symptoms will not improve without treatment, the first line of which is antipsychotic medication.   Tr., 19–20, 32, 41–42; Doc. No. 245-1, at 9–10.   She further testified that when antipsychotic medications are administered, between 70–80 percent of individuals are restored to competency, however she acknowledged that there was no guarantee that competency would be restored.   Tr., 20, 35, 38–39.   According to Dr. Burton, the majority of individuals placed on antipsychotic medications are restored to competency within four to six months, but restoration can take up to 12 months.   Tr., 39.

Although some individuals typically experience minor side effects (if any) from antipsychotic medication, Dr. Burton opined that it is substantially unlikely that any potential side effects would significantly interfere with Chalifoux's ability to assist counsel.   Tr., 20–21; Doc. No. 245-1, at 11.   The nursing, medical, and

psychiatry staff at FMC Missouri monitor patients on medication, and if side effects arise, the psychiatry staff will work with medical staff to monitor the side effects, change dosages, and/or switch medications as necessary. *Id.* In addition, when an individual is medicated involuntarily for the sole purpose of competency restoration, Dr. Burton continues to routinely meet with the individual and conduct interviews. Tr., 22. She often does rounds in conjunction with psychiatry staff, and nurses also observe individuals during medication administration. *Id.* In sum, there are "plenty of opportunities" to determine when an individual is responding adequately and sufficiently to the medication to be restored to competency. *Id.*

Dr. Burton further testified that there were no less intrusive means that would achieve substantially the same results as antipsychotic medications. Tr., 22, 34–35. Competency restoration group sessions did not work due to Chalifoux's rigid beliefs, and Dr. Burton opined that no amount of talking or education would convince Chalifoux to change his beliefs. Tr., 22, 27–28, 42–43. Dr. Burton also testified that interventions such as supported housing, family therapy, and supported employment are typically only successful when used in conjunction with antipsychotic medications. Tr., 23–24. Dr. Burton further noted that on August 29, 2023, staff at FMC Missouri conducted a hearing pursuant to *Washington v. Harper*, 494 U.S. 210 (1990), to assess whether Chalifoux met the criteria for

involuntary administration of psychiatric medication due to him being a danger to himself or to others or gravely disabled, but the hearing officer determined Chalifoux did not meet that criteria.   Tr., 23, 33, 43; Doc. No. 245-1, at 6; Doc. No. 245-5; *see also* 28 C.F.R. § 549.46.   In sum, Dr. Burton opined that administering antipsychotic medication to Chalifoux was medically appropriate and in his best interest.   Tr., 24; Doc. No. 245-1, at 11.

On cross-examination Dr. Burton discussed her observations over the years as to the potential side effects of antipsychotic medications.   Tr., 36–37.[9]   Some potential side effects include sedation, tremors, elevated blood levels, and the most serious side effect she has observed, tardive dyskinesia, however this side effect is very uncommon.   Tr., 37–38, 43–44.   When a side effect becomes too onerous or burdensome for an individual, the psychiatry staff at FMC Missouri can switch medications, reduce the dosage, or add a second adjunct medication.   Tr., 38, 44. Dr. Burton further testified that it was possible for an individual to experience side effects so severe that they would impact the individual's competency-related abilities, but in those circumstances, FMC Missouri staff would address the side effects as they arise.   Tr., 39–40.

---

[9] Dr. Burton made clear that her testimony as to side effects was limited to her own experiences, as she is not a psychiatrist and therefore unable to speak with any further specificity on the issue.   Tr., 36–37.

B.    *Dr. Shawn Rice, M.D.*

The second witness to testify was Dr. Shawn Rice, who has been employed as a staff psychiatrist at FMC Missouri since January 2006.   Tr., 47; Doc. No. 245-12, at 1.   Dr. Rice received his Bachelors of Science in Microbiology and his Doctor of Medicine from the University of Oklahoma.   Doc. No. 245-12, at 1.   He is a licensed and board-certified psychiatrist, as well as an Assistant Professor of Clinical Psychiatry at the University of Missouri School of Medicine.   Tr., 47–48; Doc. No. 245-12, at 2.

Dr. Rice provides consultation for three midlevel psychiatric medication providers at FMC Missouri who provide psychiatric medication management for mental health patients.   Doc. No. 245-12, at 1–2.   Since May 2023, Dr. Rice has been working with the FMC Missouri mental health forensic team to provide medication treatment plan reports to federal courts concerning the involuntary administration of antipsychotic medications pursuant to *Sell v. United States*.   *Id.*, at 2; Tr., 49. Over his career, he has treated hundreds of patients that required involuntary medication.   Tr., 48.   Dr. Rice has also testified in federal court as an expert witness in *Sell* hearings.   Doc. No. 245-12, at 2.   Dr. Rice was admitted as an expert in psychiatry, without objection.   Tr., 46.

Dr. Rice was involved in Chalifoux's treatment while at FMC Missouri.   Tr., 49.   He met and interacted with Chalifoux and reviewed all of the reports,

including Dr. Burton's forensic psychological examination.   *Id.*    Dr. Rice concurred with Dr. Burton's diagnosis that Chalifoux is suffering from a delusional disorder and is incompetent to proceed in the absence of antipsychotic medication. Tr., 49–50, 51.   In particular, when Dr. Rice met with Chalifoux in August of 2023, Chalifoux presented with delusional thoughts regarding his legal situation, and seemed paranoid about the court.   Tr., 50.   Dr. Rice also noted Chalifoux's repeated refusals to voluntarily take antipsychotic medication.   Tr., 51.

Dr. Rice testified that in his personal experience as a psychiatrist, patients with psychotic disorders, schizophrenia spectrum-type problems, and delusional thoughts are quite often successfully treated with antipsychotic medications, with approximately 70 percent of individuals treated with such medications restored to competency.   Tr., 52, 53–54.   In particular, the medications treat and improve psychotic symptoms such as fixed false beliefs.   Tr., 52.   According to Dr. Rice, antipsychotic medications should be the first line treatment for someone suffering from delusional disorder.   Tr., 54–55.

In Dr. Rice's experience with patients in prison settings, antipsychotic medications improve the patient's ability to communicate with others.   Tr., 55. Dr. Rice testified that any side effects can be effectively managed, and at FMC Missouri patients are continuously monitored via a collaborative effort by and between psychology staff, nursing staff, medical staff (to include psychiatrists, a

nurse practitioner, and physician assistants) and corrections officers who frequently conduct rounds on the various units.    Tr., 55–57.    Dr. Rice believes that with this level of monitoring and consultation, antipsychotic medication can be administered effectively and safely.    Tr., 57.

As to the types of side effects, Dr. Rice testified that they can range from general or mild (such as dizziness, orthostatic hypertension, dry mouth, blurred vision, constipation, difficulty urinating, rashes, or weight gain) to extrapyramidal symptoms (dyskinesias, acute muscle spasms, feelings of restlessness/akathisia), to the most severe (prolonged QTc and neuroleptic malignant syndrome).    Tr., 57–59, 75–77.    The most common of these side effects are neuromuscular and weight gain, with feelings of restlessness occurring in 10–15 percent of patients on antipsychotic medications.    Tr., 58.    The more severe side effects are quite rare; dyskinesias and muscle spasms occur in about 10 percent of patients on first-generation antipsychotic medications and in less than 2 percent of patients on second-generation medications, prolonged QTc occurs in 3 patients out of 1000, and neuroleptic malignant syndrome occurs in approximately 1 in 5,000–10,000 patients.    Tr., 58–60, 85.    FMC Missouri staff monitor for these side effects and can step in as needed if a medical emergency arises.    Tr., 59–60, 85.    However, Dr. Rice further testified there is no guarantee that a patient such as Chalifoux would suffer any of these side effects.    Tr., 84.

Dr. Rice opined there are no less intrusive treatments that are likely to achieve substantially the same result in this case as involuntary antipsychotic medication, which is the first-line treatment for psychotic symptoms.   Tr., 61, 73–74.   If such medications are administered, the goal would be to reduce Chalifoux's delusional thinking such that he would be able to better participate in and make progress with other forms of treatment such as therapy.   Tr., 61.   Dr. Rice further opined that the potential benefits to Chalifoux of the medications are tremendous and outweigh the risk of any potential side effects.   Tr., 62.   In particular, the administration of antipsychotic medications could permit Chalifoux to live in a less restrictive environment, participate meaningfully in treatment, and perhaps be subject to conditional release terms, but without such medications, Chalifoux will remain chronically mentally ill.   Tr., 62–63; Doc. No. 245-11, at 4.   In sum, Dr. Rice opined that involuntary administration of antipsychotic medication would be in Chalifoux's best interest, medically appropriate, and substantially likely to restore Chalifoux's competency.   Tr., 63, 71–72; Doc. No. 245-11, at 4.

Dr. Rice authored a proposed treatment plan for Chalifoux, which Dr. Rice opined would make it substantially likely that Chalifoux would obtain competency to stand trial.   Tr., 51; Doc. No. 245-11.   Dr. Rice's proposal recommends four possible oral medications, each of which are approved for and used in the treatment of psychotic disorders such as delusional disorder:   paliperidone (Invega) at target

doses of 3 mg to 12 mg daily; aripiprazole (Abilify) at target doses of 15 mg to 30 mg daily; haloperidol (Haldol) at target doses of 2 mg to 40 mg daily; and olanzapine (Zyprexa) at target doses of 5 mg to 20 mg daily.   Doc. No. 245-11, at 1; Tr., 74–77.   Dr. Rice proposes that Chalifoux first be administered paliperidone either as an oral medication or as a long-acting injectable, and if Chalifoux does not tolerate that medication, Dr. Rice proposes switching to aripiprazole (either oral or long-acting injectable).   *Id.*   If Chalifoux does not tolerate either of these medications, then Dr. Rice proposes starting haloperidol, which is available as both an oral medication, short-acting, and long-acting injectable.   *Id.*   If Chalifoux is treated with one of the long-acting injectables and still requires further treatment, Dr. Rice proposes a trial of oral olanzapine at an initial dosage of 5 mg, increasing to 20 mg daily if indicated.   Doc. No. 245-11, at 2; *see also* Tr., 69, 78.

Dr. Rice noted Chalifoux's pre-existing conditions of constipation, hyperlipidemia, and hypertension, which are currently managed by prescription medications.   Doc. No. 245-11, at 1; Tr., 60–61.   Chalifoux also receives Motrin as needed for unspecified pain.   Doc. No. 245-11, at 1.   Dr. Rose testified that the existence of these pre-existing conditions does not present a heightened risk for other medical issues if antipsychotic mediations are administered to Chalifoux. Tr., 60–61.

Prior to the administration of any medications, Dr. Rice would meet with Chalifoux, provide him with a copy of the court order authorizing involuntary treatment by antipsychotic medications, and attempt to enlist Chalifoux's cooperation in taking the medications voluntarily. Doc. No. 245-11, at 1; Tr., 64, 69. Chalifoux would also be informed that he must cooperate with nursing staff by accepting oral medications at the daily pill line, and that he must fully cooperate with all requests by nursing staff to perform a "mouth check" to ensure Chalifoux was not concealing the medications in his mouth and spitting them out later. Doc. No. 245-11, at 2; Tr., 65. Chalifoux would also be informed of the requirement to cooperate with all periodic lab tests to measure the serum concentration of the prescribed antipsychotic medications, with such testing necessary to assist with any dosing adjustments. Doc. No. 245-11, at 2. Potential side effects would also be explained to Chalifoux, he would be instructed to inform FMC Missouri staff if he experiences any side effects, and assurances would be provided that medical staff would address any concerns. Tr., 65–66.

In the event Chalifoux refused to voluntarily accept treatment with the aforementioned medications, Dr. Rice proposes that treatment would instead proceed with long-acting antipsychotic medications, first using paliperidone Sustenna or aripiprazole lauroxil (Aristada), but only if it is determined that Chalifoux can tolerate a course of oral doses of these medications. Doc. No. 245-

11, at 2.  If Sustenna is used, the dosage would be 234 mg intramuscularly on day one, 156 mg seven days later, followed by 234 mg every four weeks thereafter.  *Id.* If Aristada is used, the dosage would be 882 mg intramuscularly every four weeks. *Id.*, at 3.  If haloperidol is required, it would be first be offered as an oral medication, and if Chalifoux refused, the first dose would be a 5 mg intramuscular injectable, and if after five days Chalifoux continued to refuse oral medications, the dosage would change to 50 mg of haloperidol decanoate, every two weeks.  *Id.* The dosage could be modified as needed, with injectable dosages ranging from 75 mg to 200 mg every two, three, or four weeks.  *Id.*  An injection of diphenhydramine 25 mg may be given in conjunction with the short acting haloperidol injections to prevent any extrapyramidal side effects.  *Id.*; *see also* Tr., 69–70.

If Chalifoux were to experience any side effects from the medications, Dr. Rice's treatment plan provides that Chalifoux would be offered the lowest effective dosage of adjunctive medication to manage the side effects, and if necessary and appropriate, medications could be switched.  Doc. No. 245-11, at 3; Tr., 66–67.  If muscle stiffness or tremors exhibited, Chalifoux would receive benztropine between .5 mg to 1 mg two or three times daily as needed; for restlessness he would be offered propranolol at a dosage between 10 to 40 mg two or three times daily as needed.  Doc. No. 245-11, at 3.  If Chalifoux experienced neuromuscular side

effects that were not responding to these treatments, he would also be offered short courses of lorazepam at doses between .5 mg to 1 mg two or three times daily as needed, and if the neuromuscular side effects persisted, alternative antipsychotic medications would be considered.   *Id.*   And if Chalifoux became agitated or combative during the process of receiving an injection, he could also receive a 2 mg injection of lorazepam to calm him down.   *Id.*; Tr., 70.

Chalifoux would be monitored while taking antipsychotic medications for possible development of diabetes or elevated serum lipids, to include monthly weight checks and periodic fasting glucose and serum lipids testing.   Doc. No. 245-11, at 3; Tr., 65, 71.   Chalifoux would also be subject to monthly monitoring of his vital signs, a baseline electrocardiogram would be taken at the beginning of his course of treatment, as well as a baseline Abnormal Involuntary Movement Scale assessment to monitor any movement problems or tardive dyskinesia.   Tr., 64–65, 79.   FMC Missouri staff would attempt to obtain Chalifoux's cooperation in this monitoring, but if he refused, the monitoring protocols would be enforced involuntarily approximately every 90 days.   Doc. No. 245-11, at 3–4; Tr., 80.

On cross-examination, Dr. Rice described the process by which an unwilling patient is restrained so that medications can be administered.   Tr., 81–83. Pursuant to BOP policy, a five person "use-of-force team" would coordinate to first make one last attempt to obtain voluntarily participation, and if that fails, the team

would restrain and hold down the patient, and an injection of intramuscular Haldol would be administered. Tr., 81–82, 85–86, 87. The "use-of-force team" often deploys OC spray in an attempt to get the patient to submit to hand restraints, and depending on the situation, Dr. Rice may also administer a sedative. Tr., 82. Dr. Rice is unaware of any instance where a patient was unable to be restrained so that medication could be administered. Tr., 83. Moreover, this restraint process is considered for each periodic dosage — meaning a patient can be uncooperative one time and the next time the patient can volunteer to take the medication – negating the need for any use of force. Tr., 87.

C.    *Dr. Richart L. DeMier, Ph.D.*

The final witness to testify was Dr. DeMier, a board-certified forensic psychologist. Tr., 88. Dr. DeMier received his Bachelors of Arts in Psychology from the University of Missouri, and both his Masters of Science in Clinical Psychology and Ph.D. in Clinical Psychology from the University of Wisconsin. Doc. No. 245-10, at 1. From October 1995 through December 2016, Dr. DeMier worked as a psychologist at FMC Missouri, where he conducted forensic and clinical evaluations of male inmates and detainees, completed approximately 350 competency evaluations and 200 competency restoration treatment and evaluation cases, and testified approximately 100 times in federal court. *Id.*, at 2; Tr., 88. Between 2002 and 2013, Dr. DeMier also served as the Director of Clinical Training

and was responsible for the administration of FMC Missouri's APA-accredited psychology internship.   Doc. No. 245-10, at 2.

Dr. DeMier has been in private practice since June 2016, conducting criminal forensic evaluations and testifying as an expert in criminal matters, including competency and civil commitment proceedings.   Doc. No. 245-10, at 1.   Dr. DeMier also provides expert testimony and opinions in military trial matters and court martials.   *Id.*, at 2.   Dr. DeMier is also an adjunct faculty member at Drury University, teaching various psychology courses, and has authored numerous publications and presentations.   *Id.*, at 3–7.   Dr. DeMier was admitted as an expert in forensic psychology, without objection.   Tr., 89.

On two separate occasions, Dr. DeMier attempted to interview Chalifoux. Tr., 89.   The first attempt did not take place due to Chalifoux's transport from FMC Missouri back to the Middle District of Florida.   Tr., 89; Doc. No. 245-9, at 2.   The second attempt was a videoconference interview with Chalifoux while he was detained at Seminole County Jail; however, Chalifoux refused to talk to Dr. DeMier. Tr., 89–90; Doc. No. 245-9, at 2.

Dr. DeMier prepared two forensic psychological reports, one dated January 29, 2024 and the other dated March 21, 2024.   Doc. Nos. 245-8, 245-9.   Both reports are based solely on Dr. DeMier's review of various records, and they are identical save for the March 21, 2024 report discusses the attempted videoconference

interview at Seminole County Jail.   *Id.*   The undersigned therefore focuses on the

March 21, 2024 report.   Doc. No 245-9.

Dr. DeMier reviewed Dr. Otto's and Dr. Burton's reports, Dr. Rice's proposed

treatment plan, the United States' memorandum of law in support of involuntary

administration of antipsychotic medications (Doc. No. 190) and the November 17,

2023 interim status report from FMC Missouri.   Doc. No. 245-9, at 1.   In his report,

Dr. DeMier summarizes the diagnoses and findings of Dr. Otto and Dr. Burton, as

well as the interim status report.   *Id.,* at 2–4.   Dr. DeMier agreed with Dr. Otto's

and Dr. Burton's diagnosis of delusional disorder, noting that their reports laid out

the specific symptoms that led to their diagnoses, and that there were no particular

flaws or shortcomings in their reports.   *Id.,* at 4–5; Tr., 91.   With respect to Dr.

Rice's proposed treatment plan, Dr. DeMier noted that the medications listed in the

treatment plan "are widely used medications that have been shown to be effective

in the treatment of psychotic disorders," and that Dr. Rice included proposed

treatments for any side effects, as well as addressed the risks and potential liabilities

of involuntary treatment.   Doc. No. 245-9, at 4.

Dr. DeMier also discussed the various factors involved in the consideration

of whether to involuntarily administer antipsychotic medications and agreed that

"the treatment of choice for a psychotic disorder is antipsychotic medication,"

which is also the intervention of choice for Chalifoux's delusional disorder

diagnosis.   Doc. No. 245-9, at 5.   Dr. DeMier further opined that antipsychotic medication "is essential to the effective treatment of psychotic disorders," and that given Chalifoux's reticence to speak with Dr. Burton, "it is reasonable to conclude that a psychotherapeutic approach for Mr. Chalifoux would be ineffective."   *Id.*; Tr., 98, 101.   Dr. DeMier also agreed that while not a guarantee, mental health treatment that includes the administration of psychiatric medications "is usually sufficient to restore a defendant to competency," noting studies where 79% of treated defendants are rendered competent to stand trial.   Doc. No. 245-9, at 5–6; Tr., 98–99.

Dr. DeMier agreed that while most medications have some risk of side effects, antipsychotic medications tend to have fewer side effects than other types of medications, with the vast majority of patients reporting no serious side effects. Doc. No. 245-9, at 6.   Dr. DeMier also summarized the various types of side effects, which for the most part paralleled the testimony and opinions of Dr. Rice, particularly with respect to the opinion that the most common side effects are mild/nuisance level (stiffness, restlessness, dry mouth, blurry vision) and can be effectively treated with other medications.   *Id.*; Tr., 91–92, 99.   Dr. DeMier agreed that the most serious side effects (tardive dyskinesia and neuroleptic malignant syndrome) are far less common and/or rare.   Doc. No. 245-9, at 6; Tr., 99.

Dr. DeMier further opined, based on his review of the provided records, that effective treatment of Chalifoux's paranoid and fixed beliefs is likely to enhance the fairness of any legal proceedings.   Doc. No. 245-9, at 6; Tr., 99.   In conclusion, Dr. DeMier opined that "a trial of antipsychotic medication is reasonable, provided that Mr. Chalifoux is monitored carefully for both side effects and therapeutic benefits." Doc. No. 245-9, at 7.[10]   However, as noted both in Dr. DeMier's report and in his testimony, it is possible that his opinions would be different had he met with Chalifoux, and his conclusions may have changed if he ultimately did not agree with the diagnosis of delusional disorder.   *Id.,* at 1, 4–5; Tr., 90–91, 94–95, 97.

In sum, during both the competency hearing and in his report, Dr. DeMier did not dispute or challenge any of the opinions of Dr. Otto, Dr. Burton, or Dr. Rice. Tr., 91–92, 94, 97–98; Doc. No. 245-9.   With respect to the methods used to restrain an uncooperative patient, Dr. DeMier's testimony also mirrored that of Dr. Rice, particularly in that every opportunity is made to convince a patient to take the medications voluntarily before forcible restraints are utilized.   Tr., 92–93.   And Dr. DeMier agreed there is no guarantee that antipsychotic medications will restore a

---

[10] Dr. DeMier also discussed in his report the need to regularly monitor patients while they are taking antipsychotic medications, with such monitoring providing an additional safeguard as to the fairness of any trial or other legal proceedings.   Doc. No. 245-9, at 7.   Last, Dr. DeMier noted the importance of a patient's treatment history, although no such history exists in this case.   *Id.*

person to competency, but that the use of these medications is reasonable and much more likely to help than hinder.   Tr., 95, 99–100.[11]

D.    *Other Evidence*

In addition to this witness testimony, the undersigned has considered all other admitted exhibits.   This includes Dr. Otto's curriculum vitae, and his April 1, 2022 forensic psychological evaluation report for Chalifoux.   Doc. Nos. 245-3; 245-4.   There is no dispute that Dr. Otto is a highly qualified expert in the area of forensic psychology, and his report explained the basis of Dr. Otto's diagnosis of delusional disorder, persecutory type, and his opinion that Chalifoux's paranoid and delusional thinking rendered him incompetent to proceed.   Doc. No. 245-3, at 5, 9.   Dr. Otto did not opine on any issues related to the involuntary administration of antipsychotic medications, as his evaluation of Chalifoux occurred prior to the restoration process.

Last, the undersigned considered Chalifoux's indictment (Doc. No. 1), plea agreement (Doc. No. 68), and presentence investigation report (Doc. No. 79), and discusses them as appropriate throughout the remainder of this Report.

---

[11] Dr. DeMier also testified that most patients start to show therapeutic benefits within one to three months of beginning a course of medication, but if a patient does not show improvement within a year, then he would opine that the patient is not capable of restoration within any reasonable period of time.   Tr., 96, 100.

### III.    LEGAL STANDARD

In *Sell v. United States*, 539 U.S. 166, 180–81 (2003), the Supreme Court found that it was constitutionally permissible to administer antipsychotic medication to a mentally ill detainee in order to render him competent to stand trial if the United States shows by clear and convincing evidence: (1) the existence of "important governmental interests"; (2) that the "involuntary medication will significantly further those concomitant state interests"; (3) that the involuntary medication is "necessary" to further the important interests; and (4) that the administration of the medication is "medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition."    The United States bears the burden of proving the necessary factual findings by clear and convincing evidence.    *United States v. Diaz*, 630 F.3d 1314, 1331–32 (11th Cir. 2011).

"Before even applying the *Sell* factors, a district court first should consider whether involuntary medication is appropriate on the ground that the defendant poses a danger to himself or others.    Involuntary medication is permitted in those situations under *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)."    *United States v. Ruark*, 611 F. App'x 591, 597 n.5 (11th Cir. 2015) (citing *Sell,* 539 U.S. at 183).[12]    In addition, while the Eleventh Circuit has not directly

---

[12] Unpublished opinions of the Eleventh Circuit are cited as persuasive authority. *See* 11th Cir. R. 36–2.

addressed the issue, at least one other Circuit and several district courts in this

Circuit have held that an administrative hearing pursuant to 28 C.F.R. § 549.46 must

also be held prior to making any findings under *Sell.  See, e.g., United States v. White*,

431 F.3d 431, 434 (5th Cir. 2005); *United States v. Richardson*, No. 3:08-cr-302-J-32TEM,

2009 WL 4730563, at *2 (M.D. Fla. Dec. 7, 2009); *United States v. Diaz*, No. 1:04-cr-

0251-BBM, 2009 WL 10670548, at *5 (N.D. Ga. Oct. 13, 2009); *United States v. Milliken*,

No. 3:05-cr-6-J-32TEM, 2006 WL 2945950, at *3 (M.D. Fla. Oct. 13, 2006); *see also*

*United States v. Muhammad*, 398 F. App'x 848, 849 (3d Cir. 2010) ("Before a court

reaches *Sell's* four-part inquiry, however, the government ordinarily must show

why medication cannot be administered pursuant to other procedures, such as

those described in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178

(1990), or 28 C.F.R. § 549.43.").[13]

## IV.    ANALYSIS

### A.    *Is Chalifoux a Danger to Himself or Others?*

Before considering whether to involuntarily administer medications to

restore competency under *Sell v. United States*, a court must first consider the

---

[13] 28 C.F.R. § 549.46 sets forth the procedures for conducting an administrative hearing when the BOP wishes to involuntarily administer psychiatric medication to an inmate on the basis of dangerousness or gravely disabled.   28 C.F.R. § 549.46(a)(1) – (10). Until August 11, 2011, these procedures were set forth in 28 C.F.R. § 549.43.   Effective August 12, 2011, those requirements are now listed in 28 C.F.R. § 549.46.   The undersigned finds that the decisional authority cited above, which discuss the prior regulation, apply equally to the current regulation, as the regulations are in large part identical.

threshold issue of whether forced medication is warranted due to a defendant being a danger to himself or others in the facility in which he is being confined, or due to a defendant being gravely disabled. *Harper*, 494 U.S. at 225. As noted above, FMC Missouri conducted a hearing on August 29, 2023 to determine whether involuntary medication should be administered on the basis of dangerousness or gravely disabled. Doc. No. 245-5. Chalifoux was provided advanced written notice of the hearing, which included advising him of his rights to appear at the hearing, to present evidence, to have a staff representative present, to request witnesses, and to request that witnesses be questioned by the staff representative or hearing officer. *Id.*, at 2, 5, 7–8. The hearing was conducted by a psychiatrist who was not involved in Chalifoux's treatment or diagnosis, and two witnesses were called — Dr. Rice and Dr. Burton. *Id.*, at 1, 3, 9.[14] Chalifoux did not speak at the hearing, did not request a staff representative (although one was appointed and present), did not present any witnesses, and did not appeal the decision. *Id.*, at 1–2. At the conclusion of the proceeding, the hearing officer issued a written determination that no evidence was presented to support a finding that Chalifoux was a danger to himself or to others in his current setting, nor that Chalifoux was gravely disabled. *Id.*, at 4, 9. As such, the request for involuntary medication was not approved. *Id.*

---

[14] At the time of the hearing, Dr. Burton's last name was Hampton. Doc. No. 245-5; Tr., 45.

Based on this evidence, and in the absence of any argument to the contrary, the undersigned finds the requirements of *Washington v. Harper*, 494 U.S. 210, have been met.   *See United States v. Milliken*, No. 3:05-cr-6-J-32TEM, 2007 WL 114001, at *1 (M.D. Fla. Jan. 10, 2007); *Diaz*, 2009 WL 10670548, at *5; *see also* 28 C.F.R. § 549.46.[15] As such, the undersigned now turns to each of the *Sell* factors.

     B.     *Important Governmental Interests.*

The first factor to consider under *Sell* is whether an important government interest exists.   As the Supreme Court held:

> First, a court must find that *important* governmental interests are at stake.   The government's interest in bringing to trial an individual accused of a serious crime is important.   That is so whether the offense is a serious crime against the person or a serious crime against property. . . .   Courts, however, must consider the facts of the individual case in evaluating the government's interest in prosecution.

*Sell*, 539 U.S. at 180.   "Thus, if a crime of which [the defendant] is accused is 'serious,' then the government's interest in prosecuting [the defendant] is

---

[15] 28 C.F.R. § 549.46 expressly provides that the requirements for an administrative hearing to determine whether medication should be involuntarily administered on the basis of dangerousness do not apply to proceedings to assess whether medications should be involuntarily administered for the purposes of restoring competency.   28 C.F.R. § 549.46(b)(2).   However, because the Supreme Court in *Washington v. Harper* mandates that a dangerousness assessment must first be undertaken prior to considering involuntary medication under *Sell*, the undersigned has considered whether the BOP complied with 28 C.F.R. § 549.46 as part of the analysis as to whether a proper dangerousness assessment was first made.   And as discussed above, the undersigned finds that the BOP fully satisfied that regulation.

'important.'"   *United States v. Fuller*, 581 F. App'x 835, 836 (11th Cir. 2014).   This same standard applies to the Government's interest in sentencing a defendant.   *See United States v. Cruz*, 757 F.3d 372, 384 (3d Cir. 2014) (listing important governmental interests in restoring a defendant's mental competency for sentencing proceedings).[16]   However, the Government's interest in prosecuting persons charged with serious crimes can be mitigated with special circumstances.   *Sell*, 539 U.S. at 180.   The Supreme Court identified those special circumstances as follows:

> The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime.   We do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecution.   And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost.   The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution.   The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b)).   Moreover, the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one.

---

[16] The undersigned addresses the standard with respect to sentencing given that Chalifoux previously pleaded guilty.   *See* Doc. Nos. 59, 65, 68.   Chalifoux's motion to withdraw his plea remains pending, Doc. No. 114, therefore the undersigned also considers the Government's interest in bringing a defendant to trial, as appropriate.

*Id.*; *see also United States v. Rashid*, No. 19-cr-20803-BLOOM, 2023 WL 8111833, at *2 (S.D. Fla. Nov. 21, 2023).

>    1.    *Seriousness of the Alleged Offense.*

Neither the Supreme Court nor the Eleventh Circuit has provided a standard to measure whether an offense is "serious." *United States v. Francis*, No. 8:19-cr-9-T-60SPF, 2020 WL 4925323, at *2 (M.D. Fla. Aug. 21, 2020); *United States v. Rodriguez*, 281 F. Supp. 3d 1284, 1293 (S.D. Fla. 2017). However, the majority of Circuits to address this issue, as well as the majority of district courts within the Eleventh Circuit, have found that "the best objective measure of the seriousness of the alleged crime is the maximum penalty authorized by statute." *United States v. Benitez*, No. 19-cr-80141, 2020 WL 7332310, at *1 (S.D. Fla. Dec. 14, 2020) (citing *Rodriguez*, 281 F. Supp. 3d at 1293); *see also United States v. Mackey*, 717 F.3d 569, 573 (8th Cir. 2013) ("[W]e agree with those circuits that place the greatest weight on the maximum penalty authorized by statute[.]"); *United States v. Gutierrez*, 704 F.3d 442, 451 (5th Cir. 2015) ("[W]e follow the approach of several other circuits in comparing the time already served by [defendant] with the statutory maximum authorized for his indicted offenses."); *United States v. Green*, 532 F.3d 538, 550 (6th Cir. 2008) ("[W]e conclude that a district court may rely on the potential statutory penalty to determine whether the crime meets the 'serious' requirement[.]"); *United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005) ("[I]t is appropriate to focus on the maximum

penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes."); *United States v. Doten*, 699 F. Supp. 3d 1363, 1370 (S.D. Fla. 2023) ("The Court is persuaded that the statutory maximum is the best measure of seriousness . . . ."); *Francis*, 2020 WL 4925323, at *2 ("This Court agrees with the majority of circuits that have addressed this issue and finds that the best objective measure of the seriousness of the alleged crime is the maximum penalty authorized by statute." (collecting cases)); *Rodriguez*, 281 F. Supp. 3d at 1293–94 (noting the lack of controlling authority and applying the statutory maximum as a measure of seriousness).[17]

Courts that apply the statutory maximum rather than the Sentencing Guidelines do so because "the statutory maximum penalty provides an objective measure that avoids arbitrary application and 'respects legislative judgments regarding the severity of the crime,'" and because "the Sentencing Guidelines are not determined with certainty until after a defendant has been convicted; they are not binding on the court, and they reflect the views of the Sentencing Commission rather than Congress." *Rodriguez*, 281 F. Supp. 3d at 1293, 1294 (citing *Evans*, 404

---

[17] The Ninth Circuit applies the "likely guideline range" because it is "the best available predictor of the length of a defendant's incarceration." *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008). And the Tenth Circuit considers both the statutory maximum penalty, the potential advisory guideline range, and the nature and circumstances of the underlying conduct in determining whether a crime is "serious" for *Sell* purposes. *United States v. Velanzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007).

F.3d at 237); *see also United States v. Gillis*, No. 3:11-cr-18-J-34JBT, 2011 WL 7109362,

at *5 (M.D. Fla. Nov. 30, 2011) *report and recommendation adopted as modified*, 2012 WL

254019 (M.D. Fla. Jan. 27, 2012) ("Here, in the absence of controlling Eleventh Circuit

authority and noting that the guidelines are only advisory, the undersigned applies

the 'maximum penalty' test in determining that the crime with which [the]

[d]efendant is charged is serious.").   The undersigned agrees with this persuasive

authority, and also utilizes the statutory maximum penalty to assess the seriousness

of Chalifoux's alleged crimes.[18]

Chalifoux pleaded guilty to Count I, conspiracy to distribute 50 grams or

more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A).   Doc.

No. 68.   As set forth in both the plea agreement and the presentence investigation

report ("PSR"), Chalifoux faces a mandatory minimum term of imprisonment of 10

years and a statutory maximum sentence of life imprisonment.   *Id.*, at 1; Doc. No.

79, at 1.   And the PSR lists a guideline range of 120-121 months and a sentencing

---

[18] Chalifoux does not address any authority – binding or persuasive – from within this Circuit on this point, instead relying on cases from the Fourth and Ninth Circuits which consider a defendant's "likely sentence" as calculated by the Sentencing Guidelines. Doc. No. 195, at 4–5 (citing *United States v. White*, 620 F.3d 401, 415 (4th Cir. 2010); *United States v. Duncan*, 968 F. Supp. 2d 753, 763 (E.D. Va. 2013); and *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 693–94 (9th Cir. 2010)).   However, as discussed in this Report, while the undersigned adopts the statutory maximum as the guidepost for this analysis, the undersigned also addresses Chalifoux's "likely sentence" by considering the statutory mandatory minimum and the recommendation of an appropriate guideline range as set forth in the presentence investigation report of 120-121 months.   Thus, regardless of which approach is utilized, Chalifoux's alleged crime remains "serious."

recommendation of 120 months' imprisonment.   Doc. No. 79, at 38.   The penalty

Chalifoux is facing strongly weighs in favor of finding that Chalifoux's charges are

serious, and that the Government has an important interest in prosecuting him.

*See, e.g.*, *Doten*, 699 F. Supp. 3d at 1370–71 (finding statutory maximum sentence of

five years qualifies as "serious" under *Sell*); *Francis*, 2020 WL 4925323, at *3 (finding

defendant was facing serious charges under the first *Sell* prong where statutory

maximum ranged from 10 years' mandatory minimum to 20 years' imprisonment,

and where the estimated Sentencing Guidelines range was 78–97 months if the

defendant pleaded guilty, and 120–151 months or 108–135 months if defendant was

convicted at trial); *United States v. Walton*, No. 08-20599-BC, 2009 WL 3562507, at *2

(E.D. Mich. Oct. 28, 2009) (finding charge that carried a maximum penalty of 10

years' imprisonment constituted a serious offense).[19]

Next, a Court must review the conduct underlying the charged offenses to

determine if an offense is sufficiently serious.   *See, e.g.*, *Fuller*, 581 F. App'x at 836

---

[19] The undersigned notes that if Chalifoux is successful in his quest to withdraw his guilty plea, he will be facing additional charges for distribution of a substance containing a detectable amount of heroin and 5 grams or more of methamphetamine (Counts II and III, respectively), and for aiding and abetting in the distribution of 5 grams or more of methamphetamine (Count IV), *see* Doc. No. 1, for which Chalifoux would also be subject to a mandatory minimum term of imprisonment of 20 years up to life for Count II, and a mandatory minimum term of 5 years imprisonment up to 40 years for each of Counts III and IV, in addition to the projected sentence he currently faces as to Count I.   *See* 21 U.S.C. §§ 841(b)(1)(C) and 841(b)(1)(B).   The United States could also pursue a sentencing enhancement under 21 U.S.C. § 851(a)(1).   *See* Doc. No. 68, at 3.   In other words, there is no scenario where Chalifoux is not facing serious charges.

(concluding that the charged offense and underlying facts of the offense were sufficiently serious for a felon found in possession of a firearm by his parole officer triggered by threats made against law enforcement officers).   As set forth in the PSR, Chalifoux conspired to distribute methamphetamine and heroin via a series of six controlled buys over a two-month period, with several of those purchases taking place at Chalifoux's residence.   Doc. No. 79, ¶¶ 13–30.   When Chalifoux was arrested, he was found to be in possession of over $1000 in cash, along with unspecified amounts of heroin, crack cocaine, powder cocaine, crystal methamphetamine, Xanax pills, and suboxone pills.   *Id.*, ¶ 28.   In sum, Chalifoux was responsible for distributing 113.7 grams of methamphetamine and 10.246 grams of heroin.   *Id.*, ¶ 30.   These facts further demonstrate the seriousness of Chalifoux's charges, and when considered along with the statutory maximum penalty, support a finding that the United States has satisfied the first *Sell* factor. *See United States v. Chatmon*, 718 F.3d 369, 374–75 (4th Cir. 2013) (finding charge of conspiracy to distribute crack cocaine and heroin was a serious crime satisfying the first *Sell* factor where defendant faced mandatory minimum sentence of 10 years up to life, which was subject to potential enhancement to 20 years mandatory minimum sentence); *United States v. Ramos Lemus*, No. 5:15-CR-143-FL-1, 2016 WL 7131934, at *8 (E.D.N.C. Nov. 15, 2016) (finding that government had important interest in trying a defendant charged with one count of possession with intent to

distribute a quantity of cocaine and one count of using or carrying/brandishing a firearm during and in relation to a drug trafficking crime, where defendant faced a mandatory minimum as to one of the charges of not less than seven years up to life imprisonment).

2.    *Special Circumstances*

Chalifoux acknowledges that he is facing a serious charge which establishes an important government interest.   Doc. No. 195, at 4.   However, Chalifoux argues that special circumstances exist that mitigate the United States' interest in this case.

a.    *Length of Pretrial Detention*

First, Chalifoux contends that the length of time for which he has already been incarcerated, including time for an anticipated interlocutory appeal and *en banc* review, lessens the Government's interest.   Doc. No. 195, at 5.   On this point the Eleventh Circuit has held, in an unpublished decision, that the length of pretrial detention may constitute a special circumstance "if an individual serves time equal to or greater than his likely sentence if found guilty."   *Ruark*, 611 F. App'x at 598; *see also Francis*, 2020 WL 4925323, at *3.   Here, Chalifoux has been in the custody of the USM and/or the BOP since February 11, 2021.   Doc. Nos. 9, 15, 49.   However, he is facing a mandatory minimum term of 10 years' imprisonment, with a recommended guideline range of 120-121 months, *see* Doc. No. 79, at 38, thus his

detention to date (42 months) equates to approximately 35% of his anticipated sentence.[20]   Even considering time spent on any potential appeals (an additional 6–12 months), as well as the time necessary for any medications to take effect (anywhere from 3–12 months), the outer limits of Chalifoux's pretrial detention would be 66 months, or just over 50% of Chalifoux's anticipated sentence (again assuming his plea is not withdrawn).   *See United States v. Sledge*, No. 1:08-CR-9/RS-WCS, 2011 WL 635868, at *2 (N.D. Fla. Feb. 11, 2011) (considering 6–12 months for appeals and 4–8 months for medications to take effect in assessing whether the length of pretrial detention constituted a special circumstance outweighing the government's interests); *United States v. Duncan*, 968 F. Supp. 2d 753, 763–65 (E.D. Va. 2013) (adding an additional 18 months to a defendant's current time of detention to account for appeals in assessing whether time served outweighs the government's interest in proceeding to trial).

Given the length of Chalifoux's anticipated prison term, even under the most liberal of calculations, his length of time served will not be equal to or greater than his likely sentence.   As such, the undersigned does not find Chalifoux's length of pretrial detention to be a special circumstance that weakens the Government's

---

[20] This calculation assumes Chalifoux's plea is enforced.   If it is not, then the calculation weighs even more in favor of the United States, given the extended sentences Chalifoux would face as to his other counts, as well as a potential 21 U.S.C. § 851 enhancement.

interests.  *See, e.g.*, *Ruark*, 611 F. App'x at 598 (finding that pretrial detention of more than three years did not constitute a special circumstance for *Sell* purposes where the crimes charged "carry mandatory sentences well in excess of his current pretrial detention"); *United States v. Pfeifer*, 661 F. App'x 618, 620–21 (11th Cir. 2016) (defendant's 14-month pretrial detention, which amounted to a "sizeable portion of his expected sentence" did not outweigh the Government's interest in proceeding to trial); *Rashid*, 2023 WL 8111833, at *10 ("Defendant is correct that under *Sell*, the length of time already spent in confinement may be a special circumstance mitigating the Government's important interest in forcibly medicating a defendant to stand trial.   However, the 46 months Defendant has spent at time of the filing of his Response does not present a special circumstance given the twenty-year statutory maximum sentence he is facing."); *see also Evans*, 404 F.3d at 237–39 (finding that the Government's interest was not defeated where the crime charged carried a ten-year maximum sentence even though the defendant had already served more than two years in pretrial detention).

### b.    Civil Commitment

Second, Chalifoux argues that the "specter of civil commitment upon a dangerousness finding" undermines the Government's interests.   Doc. No. 195, at 5–6.  "Civil commitment may diminish the risks attached to releasing an accused criminal without punishment."   *Ruark*, 611 F. App'x at 598.   However, "the mere

possibility of civil commitment does not undermine the Government's interest in

prosecution."   *Francis*, 2020 WL 4925323, at \*3 (quoting *Gillis*, 2011 WL 7109362, at

\*6, *report and recommendation adopted as modified*, 2012 WL 254019 (M.D. Fla. Jan. 27,

2012)); *see also Sell*, 539 U.S. at 180 ("The potential for future confinement affects, but

does not totally undermine, the strength of the need for prosecution.").

Chalifoux's argument on this point is purely speculative and therefore

unpersuasive.   There is no indication from the record at present that Chalifoux

would be subject to civil commitment, and no witnesses presented any testimony

on the subject.   Such commitment would require a determination, under 18 U.S.C.

§§ 4246 or 4248 that upon release Chalifoux would create "a substantial risk of

bodily injury to another person or serious damage to property of another," or that

he is a "sexually dangerous person."   18 U.S.C. §§ 4246(a), 4248(a).   No such

assessment has been made; to the contrary, the administrative hearing at FMC

Missouri found no evidence of dangerousness.   *See* Doc. No. 245-5.   Thus, "it

would be pure speculation for the Court to forecast [Chalifoux's] lengthy civil

commitment, and 'the government's interest in prosecution is not diminished if the

likelihood of civil commitment is uncertain.'"   *Rodriguez*, 281 F. Supp. 3d at 1296

(quoting *Gutierrez*, 704 F.3d at 450); *see also Ruark*, 611 F. App'x at 598 (no special

circumstances diminished the importance of the governmental interest where there

was "no evidence as to his likelihood of civil commitment"); *Francis*, 2020 WL

4925323, at *3 (rejecting similar argument as to the possibility of future civil commitment as "notfhing more than conjecture"); *United States v. Grant*, No. 3:14-cr-148-J-34MCR, 2015 WL 13741550, at *5 (M.D. Fla. Aug. 27, 2015), *report and recommendation adopted as modified*, 2015 WL 6769491 (M.D. Fla. Nov. 6, 2015) ("The undersigned finds that the mere possibility of civil confinement does not undermine the Government's interest in prosecution."); *United States v. Fuller*, No. 5:12-CR-35 (CAR), 2014 WL 12521724, at *3 (M.D. Ga. Feb. 11, 2014), *aff'd*, 581 F. App'x 835 (11th Cir. 2014) (finding no special circumstances weakened the Government's important interest in bringing the defendant to trial where there was little, if any, evidence to suggest that civil commitment was a viable possibility beyond a conclusory statement without factual support that it could be an "option" if the court did not approve involuntary medication).

### c.    *Insanity Defense*

Third, Chalifoux speculates that if his case goes to trial, he may assert an insanity defense, and that if he is found not guilty by reason of insanity, he may also have to undergo a dangerousness assessment, both of which can be impacted by involuntary medication.   Doc. No. 195, at 6–7.   More specifically, Chalifoux argues that if he is involuntarily medicated, the jury will not be able to fully consider the degree of Chalifoux's condition and, in turn, his insanity defense.   *Id.*, at 6. Chalifoux further posits that given his consistent diagnosis of delusional disorder,

the likelihood of a not guilty verdict by reason of insanity is significantly high, thereby diminishing the Government's interest in bringing Chalifoux to final judgment.  *Id.*

This argument is also based on conjecture, without any evidentiary support, and therefore unpersuasive.   Chalifoux has never raised an insanity defense in this case and has not presented any evidence – expert or otherwise – suggesting that such a defense will be raised.   The undersigned does not find that such unsupported speculation constitutes a special circumstance which would negatively impact the Government's interest in this case.  *See Rashid*, 2023 WL 8111833, at *11 (finding a possible insanity defense did not outweigh the Government's interest in forcibly medicating the defendant to restore his competency in order to stand trial, particularly where defendant presented no evidence on the matter).   Relatedly, while there is undisputed ample evidence that Chalifoux suffers from a mental disease, it is not clear that the offenses he has been charged with and/or pleaded to are the product of his delusional disorder.  *See United States v. Ruark*, No. 1:10-CR-160-ODE-GGB, 2014 WL 4966913, at *8 (N.D. Ga. Oct. 2, 2014), *aff'd*, 611 F. App'x 591 (11th Cir. 2015) (rejecting possibility of insanity defense as a special circumstance where defendant did not present any evidence that it would apply, and noting that while there was "strong evidence" that the defendant suffered from a mental illness, it was not clear that the offenses charged

were a product of that mental illness); *see also United States v. Claflin*, 670 F. App'x 372, 373 (5th Cir. 2016) (affirming district court's order that defendant be forcibly medicated to restore competency, and noting that "nothing about being restored to competency to stand trial would prevent [defendant] and his counsel from presenting an insanity offense as insanity and competency to stand trial are different legal characteristics"); *United States v. Mikulich*, 732 F.3d 692, 699–700 (6th Cir. 2013) ("[E]ven if we were to assume *arguendo* that an insanity defense is relevant to the *Sell* calculus, Mikulich has presented insufficient evidence to demonstrate any appreciable likelihood of his success on the merits of the defense, and has thus failed to undermine the Government's interest in prosecution."). *Cf. Duncan*, 968 F. Supp. 2d at 766–67 (finding special circumstances existed to mitigate the Government's important interests where the Government's own experts believed the defendant lacked the *mens rea* necessary to be convicted); *United States v. Sheets*, No. 3:07-CR-68, 2008 WL 4614330, at *3 (E.D. Tenn. Oct. 15, 2008) (denying request to involuntarily medicate defendant where evidence existed demonstrating that the defendant was not sane at the time of the crime, and it was likely that a trial would result in a verdict of not guilty by reason of insanity).

In sum, the undersigned finds that Chalifoux's length of time already served, potential for civil commitment, and/or possible insanity defense do not outweigh or mitigate the United States' interest in forcibly medicating Chalifoux to restore his

competency to either proceed to sentencing or to trial.  As such, and given the statutory maximum penalty along with the serious nature of the offense, the undersigned will recommend that the Court find the United States has met its burden of proof by clear and convincing evidence that an important Government interest exists in this case.  *See Rashid*, 2023 WL 8111833, at *11–12 (finding that the government met its burden of proof by clear and convincing evidence on the first *Sell* factor based on the 20-year statutory maximum penalty, the conduct underlying the charged offense, and that neither the possibility of civil commitment nor the possibility of an insanity defense constituted special circumstances outweighing the Government's interest in bringing the defendant to trial); *Doten*, 699 F. Supp. 3d at 1370–74 (the court was satisfied by clear and convincing evidence that the first *Sell* factor was met given the statutory maximum of the offense, defendant's credit for time served was "just over half of the statutory maximum sentence [but still] insufficient to outweigh the Government's interest in forcibly medicating [d]efendant," and no other special circumstances lessened the Government's interests).

   C.    *Significant Furtherance of the Government's Interest*

   The second *Sell* factor is whether involuntary medication will significantly further the Government's interest.  The Eleventh Circuit has held that "district courts must consider and determine two underlying factual questions: (1) whether

medication is 'substantially likely to render the defendant competent to stand trial,'
and (2) whether the medication is 'substantially unlikely to have side effects that
will interfere significantly with the defendant's ability to assist counsel in
conducting a trial defense, thereby rendering the trial unfair.'"   *Diaz*, 630 F.3d at
1332 (quoting *Sell*, 539 U.S. at 181).

As described in detail above, the evidence presented at the April 2, 2024
hearing strongly demonstrates a substantial likelihood that antipsychotic
medication will restore Chalifoux to competency and is not substantially likely to
cause side effects that would interfere with his ability to assist counsel.   All three
experts testified consistently that Chalifoux has been diagnosed with delusional
disorder, that counseling or other types of therapy would be ineffective, and that
the first line of treatment for delusional disorder is antipsychotic medication.   Tr.,
16, 19–20, 22, 23–24, 27–28, 32, 34–35, 41–43, 49–50, 51, 54–55, 61, 73–74, 91, 98, 101;
Doc. No. 245-1, at 8–10; Doc. No. 245-9, at 4–5.[21]   Importantly, all three experts also

---

[21] In his report and testimony, Dr. DeMier stated that his opinions – particularly
with respect to Chalifoux's diagnosis of delusional disorder – could have changed had he
been able to personally interview Chalifoux.   Doc. No. 245-9, at 1, 4–5; Tr., 90–91, 94–95,
97; *see also* Doc. No. 248, at 2.   Beyond pointing to this speculative statement, Chalifoux
makes no argument, nor provides any evidence or legal authority suggesting, that Dr.
DeMier's inability to interview Chalifoux bears any relevance to any of the *Sell* factors.
Moreover, Dr. DeMier testified that he agreed entirely with the diagnoses of Dr. Otto and
Dr. Burton, and the question of Chalifoux's competency, including his delusional disorder
diagnosis, has been confirmed and agreed upon by both the United States and Chalifoux
for years.   *See* Doc. No. 245-9, at 4–5; Tr., 91; Doc. Nos. 157–58; *see also* Doc. No. 195, at 6
(Chalifoux's pre-hearing briefing acknowledging "his consistent diagnosis of delusional
disorder, persecutory type by different forensic examiners over many years.").

testified, based on their own experience and the data available to them, that the administration of antipsychotic medication to Chalifoux would be substantially likely to render him competent to stand trial, with each expert referencing studies where 70–80% of individuals administered such medications are rendered competent.   Tr., 20, 35, 38–39, 52, 53–54, 63, 71–72, 98–99; Doc. No. 245-1, at 9–10; Doc. No. 245-9, at 6, 7; Doc. No. 245-11, at 4.

In addition, all three experts testified as to the nature and types of potential side effects and testified that the most common side effects are mild or nuisance level, with more severe side effects extremely rare.   Tr., 20–22, 36–40, 43–44, 57–60, 75–77, 85, 91–92, 99; Doc. No. 245-1, at 11; Doc. No. 245-9, at 6; Doc. No. 245-11, at 4. Dr. Burton and Dr. Rice both also testified that it was unlikely Chalifoux would suffer any side effects that would significantly interfere with his ability to assist counsel in his case, or that would otherwise render his trial or sentencing unfair. Tr., 20–21, 55–57, 61–63, 71–72; Doc. No. 245-1, at 11; Doc. No. 245-11, at 4.   And Dr. Rice and Dr. Burton both testified in detail as to the level of monitoring provided to individuals while taking antipsychotic drugs, as well as the avenues available to mitigate any side effects should they arise.   Tr., 22, 38–40, 44, 55–57, 64–66, 69, 71, 79, 80; Doc. No. 245-1, at 11; Doc. No. 245-11, at 1–4.   Finally, Dr. Rice discussed

---

Accordingly, the undersigned does not find Dr. DeMier's inability to interview Chalifoux bears any impact on the findings in this Report and Recommendation.

Chalifoux's own medical history, noting that his existing medical conditions were controlled by medications and did not present any additional risks if antipsychotic medications were introduced.   Tr., 60–61; Doc. No. 245-11, at 1.[22]   Dr. DeMier did not dispute any of this testimony, and frequently concurred with it.

Chalifoux did not otherwise present any evidence to challenge the experts' testimony and opinions.   Instead, he speculates that an individual may lack the capacity to consent to an EKG for purposes of monitoring for potential side effects, and that the side effects described by the Government's experts "could create a situation where the Defendant's ability to assist counsel would be impaired."   Doc. No. 248, at 1–2.   Such pure speculation does not outweigh the United States' consistent and uncontroverted evidence, which was confirmed by Chalifoux's own expert Dr. DeMier.[23]

---

[22] While there is no evidence of any treatment history for Chalifoux, the lack of such records does not weigh against the United States.   *See Diaz*, 630 F.3d at 1333 (the lack of prior documented history of the defendant's reaction to anti-psychotic medication did not alter court's conclusion that the second *Sell* factor was satisfied).

[23] In pre-hearing briefing, Chalifoux cites to *United States v. Ghane*, 392 F.3d 317, 320 (8th Cir. 2004), in which the Eighth Circuit Court of Appeals found that antipsychotic medication was not substantially likely to restore the competency of a defendant suffering from delusional disorder.   Doc. No. 195, at 7–8.   However, the court in *Ghane* reached this conclusion after receiving testimony from at least four psychiatrists, who testified that antipsychotic medication only presents a 5–10% likelihood of competency restoration. 392 F.3d at 319–20.   No such testimony exists in this case, to the contrary all three experts who testified uniformly stated that antipsychotic medication presents a 70–80% chance of competency restoration.   As such, the undersigned does not find Chalifoux's reliance on *Ghane* persuasive.   Nor does the undersigned find persuasive Chalifoux's citation to a 2002 "Textbook of Clinical Psychiatry" which states that the treatment of delusional

Accordingly, based on the testimony and opinions presented by all three experts, the undersigned will recommend that the Court find the United States has satisfied the clear and convincing evidence standard for the second *Sell* factor.   *See Diaz*, 630 F.3d at 1332–34 (finding government met second *Sell* factor by clear and convincing evidence where experts testified that based on available data and their own experiences in treating patients with similar mental illnesses, there was a substantial likelihood that antipsychotic medications would restore competency, statistical studies supported these opinions, defendant presented no evidence to the contrary, the proposed treatment plan outlined in detail the types and dosage ranges for the suggested medications as well as suggested adjunctive medications to treat any potential side effects, and experts testified that the defendant did not have any pre-existing conditions that would pose any additional risks); *Ruark*, 611 F. App'x at 598–99 (finding same based on similar evidence); *United States v. Gomes*, 387 F.3d 157 161–62 (2d Cir. 2004) (defendant with delusional psychotic disorder was substantially likely to be rendered competent given "70 percent success rate . . . through treatment (voluntary or not) with anti-psychotic medication"); *Doten*, 699 F. Supp. 3d at 1382–83 (finding second *Sell* factor satisfied where expert testified

---

disorder with antipsychotic medication "has never been properly evaluated."   Doc. No. 195, at 8.   Chalifoux did not submit this textbook as an exhibit despite having ample opportunity to do so, and the undersigned does not believe a random quote without any context outweighs the otherwise uncontroverted testimony and reports from three different experts.

that antipsychotic medication was the recommended course of treatment, studies showed roughly 75–81% of patients were restored to competency, defendant had no medical history that would suggest antipsychotic medication would not work, the expert further testified with "reasonable medical certainty," that involuntary psychiatric mediation "is substantially unlikely to interfere with [the defendant's] ability to assist his counsel," that side effects could be addressed with other medications, and the recommended treatment plan would ensure defendant was closely monitored and that side effects were minimized); *United States v. Ferguson*, Case No. 04-14041-CR-MIDDLEBROOKS/MATTHEWMAN, 2018 WL 2316726, at *5 (S.D. Fla. May 22, 2018) (finding same based on similar expert testimony and evidence); *Gillis*, 2011 WL 7109362, at *7–8, *report and recommendation adopted as modified*, 2012 WL 254019 (M.D. Fla. Jan. 27, 2012) (same); *see also United States v. Villalobos*, 590 F. Supp. 3d 1234, 1249 (D. Idaho 2022) (finding United States satisfied second *Sell* factor based on similar evidence and medical studies, involving defendant diagnosed with delusional disorder); *United States v. Baschmann*, No. 10-CR-300-A, 2015 WL 346719, at *11 (W.D.N.Y. Jan. 23, 2015) (United States provided clear and convincing evidence via expert testimony and medical studies that administering antipsychotic medication would be substantially likely to restore defendant with delusional disorder to competency).

D.    *Necessary to Further the Government's Interest*

The third *Sell* factor, "whether involuntary medication is necessary to further the government's interests," requires that the Court "(1) find any 'alternative, less intrusive treatments are unlikely to achieve substantially the same results,' and (2) 'consider less intrusive means for administering the drugs,' such as a court order backed by the power of contempt, before considering more intrusive methods." *Diaz*, 630 F.3d at 1334–35 (quoting *Sell*, 539 U.S. at 181).   A review of the evidence finds this factor also satisfied.

Dr. Burton, Dr. Rice, and Dr. DeMier all consistently testified that less intrusive means — such as psychotherapy, competency restoration group sessions, supported housing, family therapy and supported employment — would be unlikely to achieve substantially the same results.   Tr., 22–24, 27–28, 34–35, 42–43, 61, 73–74, 98, 101.   Dr. Burton further testified that these other interventions would not be effective at all unless taken in conjunction with antipsychotic medication, and no expert provided contradictory testimony.   Tr., 23–24.

Chalifoux's own conduct also supports this expert testimony — he has refused to participate in any psychological testing and refused to meaningfully participate in competency restoration sessions at FMC Missouri.   Tr., 14–15, 29–31; Doc. No. 245-1, at 4, 7; Doc. Nos. 245-6, 245-7.   He even refused to meet with his own retained expert.   Tr., 89–90; Doc. No. 245-9, at 2.   In addition, Dr. Burton and

Dr. Rice testified that multiple attempts were made to convince Chalifoux to voluntarily take antipsychotic medication, to no avail.   Tr., 18, 19; 51; *see also* Doc. No. 245-1, at 6; Doc. No. 245-6; Doc. No. 245-7.   Given Chalifoux's consistent refusals to consent to medication, the undersigned finds a contempt-backed order highly unlikely to be successful.

Further, as set forth in the proposed treatment plan and as testified to by both Dr. Rice and Dr. DeMier, before any medication would be involuntarily administered, Dr. Rice would make one additional attempt to obtain Chalifoux's compliance, which would include providing Chalifoux with a copy of the Court's order, and discussing the procedures for administering medication, and for monitoring and treating any side effects, and Chalifoux would have another opportunity to consent before each dosage is administered.   Tr., 64, 69, 81–82, 85–86, 87, 92–93; Doc. No. 245-9, at 4; Doc. No. 245-11, at 1.   Moreover, Dr. DeMier raised no objection to Dr. Rice's proposed treatment plan, instead agreeing with Dr. Rice's summary of side effects, the listed medications, and the procedures for involuntary administration.   Tr., 92–93; Doc. No. 245-9, at 4, 6.

Chalifoux points to no contrary evidence or legal authority, instead relying on speculation that "one on one psychological counseling," which was never attempted, "may have proved to be a less intrusive and more useful tool with

respect to restoring the Defendant's competency."   Doc. No. 248, at 2.   But this is nothing more than conjecture, and directly contradicts the expert testimony.

Given the uncontroverted and credible expert testimony and reports, and in the absence of any evidence or persuasive argument to the contrary, the undersigned will recommend that the Court find the United States has provided clear and convincing evidence to establish the third *Sell* factor.   *See Diaz*, 630 F.3d at 1335–36 ("Given the ample evidence presented by the government that Diaz has, repeatedly and for a time period of over a year, refused to take medication, and that alternative treatments for Diaz would be ineffective, the district court did not clearly err in concluding that the government has shown by clear and convincing evidence that involuntary medication is necessary to render Diaz competent to stand trial."); *Ruark*, 611 F. App'x at 599 (ample evidence supported finding that third *Sell* factor was satisfied where testimony established that defendant's mental condition was unlikely to recover in the absence of medication, and the non-medication alternatives, including competency restoration group, counseling, and psychotherapy, would be ineffective due to the defendant's constant paranoia); *Doten*, 699 F. Supp. 3d at 1383-84 (the United States satisfied the third *Sell* factor where expert testimony established that defendant's condition would not improve without treatment, competency would not be restored without antipsychotic medication, a court order threatening contempt would be ineffective based on

defendant's numerous prior refusals to consent to medication, and defendant would be given one last attempt to consent before proceeding with involuntary administration in accordance with a proposed treatment plan); *Rodriguez*, 281 F. Supp. 3d at 1302–03 (United States provided clear and convincing evidence to establish third *Sell* factor where experts testified that antipsychotic medication was necessary to restore competency, that no less intrusive means, such as psychotherapy, would likely achieve competency, and a court order threatening contempt would be of no effect given the defendant's repeated refusals to voluntarily consent to medication); *Ferguson*, 2018 WL 2316726, at *6 (finding third *Sell* factor satisfied based on similar evidence); *see also Gomes*, 387 F.3d at 163 (finding third *Sell* factor satisfied where defendant repeatedly refused to voluntarily take medication, indicated he would not cooperate under any circumstances, and the experts testified that the defendant would first be asked to take the medication voluntarily before it would be administered by force).   *Cf. Gillis*, 2011 WL 7109362, at *8, *report and recommendation adopted as modified*, 2012 WL 254019 (M.D. Fla. Jan. 27, 2012) (finding third *Sell* factor satisfied based on expert testimony as to necessity for antipsychotic medication and that no alternative treatments would be likely to achieve the same results, but entering a contempt-backed order for a one-month trial period where defendant testified at evidentiary hearing that he would take medication voluntarily if such an order was entered).

E.     *Medically Appropriate in Light of Defendant's Medical Circumstances*

For the fourth and final *Sell* factor, the Court must conclude that the proposed medications are "medically appropriate, *i.e.,* in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181.   Dr. Burton, Dr. Rice, and Dr. DeMier each answered this question in the affirmative.   Based on her evaluation of Chalifoux, Dr. Burton testified that administering antipsychotic medication to Chalifoux was medically appropriate and in his best interest.   Tr., 24; Doc. No. 245-1, at 11.   Dr. Rice agreed with Dr. Burton, and prepared a detailed treatment plan, consistent with acceptable medical standards, which accounts for Chalifoux's own medical conditions and diagnoses and provides procedures for monitoring and minimizing any potential side effects.   Tr., 63, 71–72; Doc. No. 245-11.   Dr. DeMier did not challenge any aspect of Dr. Rice's proposed treatment plan, instead agreeing that effective treatment with antipsychotic medication "is reasonable," so long as Chalifoux was monitored for side effects and benefits, that antipsychotic medication is much more likely to help than to hinder, and such medication would likely enhance the fairness of any legal proceedings.   Tr., 95, 99–100; Doc. No. 245-9, at 4–5, 6–7.   Chalifoux made no argument with respect to this factor, and did not challenge any aspect of Dr. Rice's proposed treatment plan.   Doc. Nos. 195, 248.[24]

_____

[24] In his pre-hearing brief, Chalifoux makes a vague statement that "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success."   Doc. No. 195, at 9.   This statement is not expanded on, and the undersigned

Based on this uncontroverted evidence, the undersigned also recommends that the Court find the United States has established by clear and convincing evidence the fourth *Sell* factor.   *See, e.g.*, *Ruark*, 611 F. App'x, at 599 (finding fourth *Sell* factor satisfied where experts testified that the administration of antipsychotic medications would be medically appropriate, and provided a detailed treatment plan describing the procedures for involuntary medication); *Doten*, 699 F. Supp. 3d at 1384-85 (finding fourth *Sell* factor satisfied based on similar evidence); *Rodriguez*, 281 F. Supp. 3d at 1303 (same); *Ferguson*, 2018 WL 2316726, at *6 (same); *Gillis*, 2011 WL 7109362, at *9 (finding fourth *Sell* factor satisfied based on expert testimony that administration of antipsychotic medication in accordance with proposed treatment plan was medically appropriate).

## V.    RECOMMENDATION

In summation, based on the evidence submitted, the undersigned finds that the United States has established each of the *Sell* factors by clear and convincing evidence.   Accordingly, for the reasons discussed throughout this Report, the undersigned **RESPECTFULLY RECOMMENDS** that the United States' request to involuntarily administer medication to Defendant Shawn Michael Chalifoux be **GRANTED,** and that the medication be administered and monitored in accordance

--------------------

does not find it to constitute any cognizable argument as to the fourth factor.

with Dr. Rice's proposed treatment plan.  Doc. No. 245-11.  The undersigned further recommends that Chalifoux be committed to the custody of the Attorney General for an additional period of four (4) months as provided under 18 U.S.C. § 4241(d) to treat Chalifoux and to administer the medication and monitor him for any side effects.

The undersigned further recommends that the Court direct the Attorney General to designate Chalifoux to FMC Missouri for this four (4) month period, that FMC Missouri provide status reports to the Court every 30 days regarding Chalifoux's treatment and status, and that upon completion of the four (4) month period, FMC Missouri provide a final evaluation and report to the Court and all parties, with such report addressing (if Chalifoux's competency is restored) whether medications should be continued during Court proceedings, how such medications might affect Chalifoux during any such proceedings, and how to monitor the effects of the medication.   Last, the undersigned recommends that if Chalifoux is restored to competency prior to the expiration of the four (4) month period, that he remain at FMC Missouri and not be transported to the Middle District of Florida until a hearing is scheduled by the Court, in order to ensure that Chalifoux continues to receive all necessary medication and mental health treatment.  *See Gillis*, 2011 WL 7109362, at *9.

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from the date the Report and Recommendation is served to serve and file written objections to the Report and Recommendation's factual findings and legal conclusions. Failure to serve written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.

Recommended in Orlando, Florida on August 27, 2024.

_____
LESLIE HOFFMAN PRICE
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record